Filed 6/4/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B298388 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078121) |
| v. | |
| ERNESTO CASILLAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge. Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, and V of the Discussion.

A jury convicted Ernesto Casillas of attempted premeditated murder and assault on a peace officer, assault with a firearm, and two counts of possession of a firearm by a felon. The jury found true allegations that Casillas personally used and discharged a firearm, and Casillas admitted he suffered a prior strike within the meaning of the Three Strikes Law. The trial court sentenced Casillas to a determinate term of 18 years, followed by a consecutive term of 55 years to life.

On appeal, Casillas raises five issues, contending that: (1) the trial court erred in admitting evidence of Casillas' immigration status and two prior deportations; (2) the evidence was insufficient to support the jury's finding that the attempted murder was premeditated; (3) the trial court erred in denying Casillas' requested self-defense and imperfect self-defense instructions; (4) the trial court violated Casillas' due process rights when it instructed the jury, pursuant to CALCRIM No. 315, to consider an eyewitness's level of certainty; and (5) the prosecutor committed prejudicial misconduct during closing argument.

In the published portion of this opinion, we conclude the trial court properly admitted evidence of Casillas' immigration status and deportation history on the limited issue of motive. In the unpublished portion of the opinion, we determine that sufficient evidence supports the jury's premeditation finding, and that the record is devoid of any evidence that would warrant the self-defense instructions requested by Casillas. Discerning no cognizable or reversible error in Casillas' remaining claims, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges arose out of two separate incidents that occurred within 12 hours of each other. In the first incident, Casillas pointed

a firearm at a civilian motorist; in the second incident, Casillas shot at a deputy sheriff during a traffic stop.

## A. Prosecution Evidence

### 1. *May 5, 2010: Counts 4 and 5*

#### a. Assault on Marcos Ramos

On May 5, 2010, at approximately 2:30 p.m., Marco Ramos was driving alone off Imperial Highway in an industrial area near his workplace. In his rearview mirror he saw a black Chevrolet truck with a gold logo approaching at a fast rate. The truck almost hit the rear of his vehicle, and then "tailgat[ed]" him in the left lane. Ramos noticed only one person, who he later identified as Casillas, in the truck.

Ramos opened his window, slowed down, put his head out, and said, "What are you doing, moron?" Casillas stopped and sped up intermittently, pulled up next to Ramos, and said, "I will shoot you, motherfucker." Ramos, said, "Okay. Go ahead and shoot me if you want to shoot me." Ramos saw Casillas was alone in the truck. Within seconds, Casillas displayed a gun over the steering wheel.

Casillas moved to the right lane and put his driver's side window halfway down. He showed Ramos the gun again, said he would shoot Ramos and asked him, "what's [your] problem?" Ramos got a good, clear look at Casillas through his passenger-side window, and saw his entire face.

Casillas called Ramos a "motherfucker" and then aggressively sped off, running through a red light. Ramos memorized part of the truck's license plate and continued driving, believing it was just another incident on the streets of Los Angeles.

#### b. Police Investigation

The next day, Ramos read the Daily Breeze newspaper, which included a photograph. He immediately recognized Casillas from

3

the photograph as the person who engaged him in the driving altercation the previous day.

Ramos subsequently went to the Carson Station with the news article and was interviewed by detectives. Detectives showed Ramos a six-pack of photographs, and he picked out photograph No. 5 (a photograph of Casillas) right away. Ramos was 100 percent sure No. 5 was the person who pointed the gun at him. The parties stipulated that the same photograph was used in the newspaper and the six-pack photo spread, although the shirt was digitally altered for the photo spread.[1]

Deputies showed Ramos pictures of Casillas' truck. The parties stipulated that Ramos said he believed the wheels were slightly different than the photographs, but thought the truck generally looked the same. Ramos told detectives that he remembered the partial license plate of the vehicle as "8WU." The license plate of Casillas' truck, as reported in the Daily Breeze article, was 8W15896.

2. *May 6, 2010: Counts 1 through 3*

a. The Shooting of Deputy Lorena Rosales

On May 5, 2010 (the Cinco de Mayo holiday), Los Angeles County Sheriff's Department Deputy Lorena Rosales worked alone on the 10:00 p.m. to 6:00 a.m. shift.

At around 1:30 a.m., Deputy Rosales saw a pickup truck straddling and driving between two lanes. She followed the truck for less than a block. It stopped at a red light, but she could not see through the rolled-up, tinted windows to determine how many

---

[1] At trial, nine years later, Ramos was asked if he saw the person depicted in position 5 of the photo spread in court. Ramos responded, "That's hard to say," then pointed to Casillas and said, "I believe it's him.

4

people were inside. She ran the license plate, 8W15896, to find the registered owner.

When the light turned green, the driver turned north onto Western Avenue. Deputy Rosales followed and activated her red and blue lights. The truck pulled over to the curb. She stopped and began to exit her patrol car; however, the driver started slowly driving away. She returned to her patrol car and followed the truck.

The truck drove north, turned east onto 257th Street, and then stopped in the middle of the road in front of Deputy Rosales' vehicle. She stopped the patrol car about a car length behind the truck and turned on her spotlight, pointed it at the driver's outside mirrors to blind the driver's eyes, and approached the truck. All the truck windows remained rolled up.

The street light in the area was out and the street was very dark. As she approached the vehicle, Deputy Rosales took her gun out of its holster. She held a flashlight in her right hand, her gun in her left hand and her left arm down at her side. The bed of the truck was unoccupied and all the windows were rolled half-down.

Deputy Rosales did not approach all the way to the driver's window because she did not feel safe crossing the area where the backseat was located. She looked to the driver's window from a position at the beginning of the back seat. She was standing three or four feet away and saw the driver. Deputy Rosales observed no one else in the truck. The driver, later identified by her as Casillas, appeared to be a Hispanic male in his early 30s, with short hair, thick eyebrows, and a "dull look on his face." His face appeared to be deliberately pressed up against the window to cover the lower half of his face. Deputy Rosales had eye contact with Casillas and he was staring at her. Based on the way Casillas was looking at her, she knew something was "terribly" wrong. She started to raise

her gun and said, "Let me see your hands." Before she could complete the command, however, she heard two muffled sounds, apparently gunshots, and immediately felt pain in her right elbow and right hip. She knew she had been shot and panicked. Her next memory was of standing behind the pickup truck. Deputy Rosales could not remember if she fired any shots.

The truck remained for a few seconds, and then drove off. Deputy Rosales sustained a through-and-through gunshot wound which left scarring on her right elbow and a five-inch bruise on her right hip.

Deputy Rosales read an article in the Daily Breeze newspaper later that day entitled "Suspect in Lomita Deputy Shooting I.D'd." She observed Casillas' photograph and immediately "knew that was him." She covered the lower half of the face, which she had not seen, and confirmed Casillas was the person who shot her.

Deputy Rosales' weapon, a nine-millimeter Beretta, was subsequently examined. Two bullets were missing from the gun. At trial she agreed that it was a fair assumption that two rounds were fired from her gun, although she had no memory of firing those rounds.

On May 8, 2010, Detective Adam Torres and his partner interviewed Deputy Rosales. She told Deputy Torres that the back window of the suspect's truck was rolled halfway down, and testified to the same at the preliminary hearing. At trial, however, the parties stipulated that the back window did not roll down, but was a "pop-out" window. Deputy Rosales agreed that if the rear window was a pop-out window, then she must have been mistaken when she believed she was looking through a window that was halfway rolled down. Nevertheless, she still recalled looking in to view the backseat of the truck and explained that, with her "powerful" flashlight, she "should have been able to see at least a

6

little bit." She agreed she could not conclusively determine whether or not someone was in the backseat.

Deputy Rosales identified Casillas in court. She previously had told officers she was 100 percent certain Casillas was the driver of the truck.

> b. Police Investigation
>> (i) *Ballistics and forensic evidence*

On May 6, 2010, at 4:00 a.m., Sheriff's Deputy Antoinette Martinez responded to the vicinity of 257th Street and Western Avenue, where a black Chevy Silverado truck, license number 8W15896, was parked. A note written on a paper towel on the front windshield stated, "Please do not park here." The driver's window was down. The truck was not running, had no keys, and had damage to the driver's side door frame, which appeared to be two bullet strikes. Damage consistent with a bullet strike was observed below the driver's door.

On the floor behind the driver's seat officers found a partially empty bottle of tequila and a glass pipe for smoking methamphetamine. Nakia Berry, a forensic identification specialist, testified that Casillas' fingerprint matched a fingerprint located on the truck's rearview mirror.

Phil Teramoto, a firearms expert, located casings of two different calibers at the scene of the shooting: two nine-millimeter casings fired from Deputy Rosales' Beretta semi-automatic pistol, and three .380 auto cartridge casings fired from a different semi-automatic firearm. He located four areas of damage to the truck caused by bullet strikes. Three shots were fired from the interior of the truck.[2] A fourth shot, fired by Deputy Rosales, struck the

---

[2] One of the bullets was caught inside the driver's side door frame; a second bullet exited the rear window frame; and the third

bottom molding of the driver's side door, but did not penetrate the door.

(ii)  *Testimony of Casillas' girlfriend*

In February 2010, Brenda Castellanos began a dating relationship with Casillas.  Casillas was from Guadalajara, Mexico, and told Castellanos he was in the United States illegally.  Casillas drove a black Chevy Silverado truck.  Casillas told Castellanos he liked to drink beer and tequila and he used crystal methamphetamine.  His cell phone contained a picture of himself holding a gun.

On May 5, 2010, at approximately 9:15 p.m., Casillas called Castellanos and asked to borrow money.  Shortly thereafter, when he arrived at her home, he was alone in his truck.  He picked up the money and left.

At about 1:50 a.m., Casillas called Castellanos again.  Based on his agitated and emotional voice, she believed he was crying.  Casillas told her he "fucked up," and was "going to get caught."  When Castellanos asked what he was talking about, he said he could not tell her and asked her to pick him up.  She refused and suggested that he get a cab.  In response, Casillas said, "I guess I can't count on you."  There was no indication anyone else was with him.  Castellanos never heard from him again.

(iii)  *Search of Casillas' residence*

On May 7, 2010, officers served a warrant for a search of the home where Casillas rented a room.  Officers found a resident alien card with Casillas' photograph, but bearing the name Juan Francisco Gonzalez "Martin."  They also found a certificate of title to a 2005 Chevy and a registration for the vehicle in Casillas' name,

---

bullet struck and damaged the top of the driver's window, which was partially rolled down at the time of the shooting.

which matched the license plate number of the truck located after the shooting.

(iv) *Prior deportations and extradition*

Dino Pivano, an agent working for Immigration and Customs Enforcement, testified that the name "Juan Francisco Gonzales" was not associated with the resident alien card number found in the home where Casillas lived. The database with Casillas' alien registration number showed two prior registrations on July 27, 2006, and June 6, 2008. The parties stipulated that Casillas was deported on each of those dates. Casillas' file did not show that he was authorized to reenter the United States.

Agent Pivano explained that, generally, the first time an individual enters the country without authorization they will not be prosecuted for illegal entry. When an alien is deported, he is warned of the legal consequences should he return to the United States without authorization. A deported person who reenters the country illegally generally will be prosecuted for illegal reentry and will face a sentence of two to 20 years in prison.

A person is more likely to be prosecuted for illegal reentry if he was previously convicted of a felony.[3] If convicted, the person will be removed from the country after serving the sentence.

Casillas was extradited from Mexico to the United States in May 2015.

## B. Defense Evidence

1. *Eyewitness Identification Expert*

Dr. Mitchell Eisen testified as a defense expert on eyewitness memory and suggestibility. He explained that divided attention

---

[3] The parties stipulated that Casillas previously had been convicted of a felony for purposes of counts 3 and 5 (felon in possession of a firearm). (Former Pen. Code, § 12021, subd. (a)(1).)

limited the amount of information that a person can take in and did not always form good long-term memories. Factors affecting attention included weapon focus at the time of an event, as well as any trauma experienced by the witness. Furthermore, the association between quick, confident decision-making and accuracy was only true when nonsuggestive, pristine identification procedures were used.

2.    *Casillas' Testimony*

Casillas testified that he had worked at various jobs in Los Angeles, using a green card with his photograph and another person's name and identification number. He admitted sustaining two prior burglary convictions. He also admitted sending Castellanos a photograph of a gun to impress her.

During the afternoon of May 5, 2010, Casillas was celebrating Cinco de Mayo and had some beers at a bar. As to Ramos, Casillas testified he "had never seen that man before."

That evening, Casillas went to the apartment complex of a man named "Henry" to buy some cocaine or crystal methamphetamine. Casillas drove Henry to a location where Henry purchased $10 worth of narcotics. They drove to a park, ingested the methamphetamine, and drank tequila. Henry suggested he could find more drugs.

Henry insisted on driving Casillas' truck. Henry purchased an additional $20 worth of drugs. He handed Casillas the narcotics and continued to drive, turning left near Western Avenue.

As they approached Western, the light turned red. A patrol car approached, activated its lights, honked loudly, and pursued them. Henry stopped the truck. Casillas had the drugs in his hands and was trying to use them. Casillas was high on methamphetamine and under the influence of tequila.

The next events unfolded "very quickly." Casillas tried to hide the methamphetamine, but then decided to remain still. Henry had a gun, and tried to hide it. Suddenly Casillas heard gun shots. He threw himself down in the truck, and his head ended up next to Henry's feet. He heard repeated shots, but could not determine whether they came from inside or outside the truck. He tried to hide as much as possible so he would not get shot. Henry sped up very quickly, kept going, and eventually stopped the truck and took off running down an alley. A few seconds later, Casillas ran in a different direction. He hid, and then called Castellanos. He told her that "something bad . . . had happened," and asked if she could come pick him up. She did not do so. Casillas heard sirens everywhere and ran. He caught a cab, and later met his cousin, Ismael, in Compton. He then fled to Mexico.

Although Casillas previously testified he did not know where the shots had been fired from, when defense counsel asked why he thought he was in trouble if he was "just the passenger," Casillas responded, "Because a weapon had just been fired from my truck on a traffic stop." He was an undocumented immigrant, had been deported twice, and assumed he would be blamed, charged, and imprisoned.

Casillas testified that at the time of the shooting he was seated in the front passenger side of the truck, not in the driver's seat, and he did not shoot Deputy Rosales.

## C. Charges and Jury Verdicts

An information filed on September 28, 2015, charged Casillas with premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1),[4] assault on a peace officer with a semiautomatic

---

[4] All further statutory references are to the Penal Code unless otherwise specified.

firearm (§ 245, subd. (d)(2); count 2), assault with a firearm (§ 245, subd. (a)(2); count 4), attempted first degree burglary (§§ 459, 664; count 6), and three counts of possession of a firearm by a felon (former § 12021, subd. (a)(1); counts 3, 5, and 7). The information also alleged that Casillas personally used and discharged a firearm (§§ 12022.5, subds. (a) & (d), 12022.53, subds. (b)-(d)), and that he had suffered a prior strike conviction. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

Prior to trial, the court dismissed counts 6 and 7 at the request of the prosecution. On April 10, 2019, the jury found Casillas guilty as charged in counts 1 through 5, and found all firearm allegations to be true. Casillas admitted the prior strike allegation.

The trial court denied Casillas' motion for new trial, and sentenced him to a determinate term of 18 years, followed by a consecutive term of 55 years to life in state prison.

## DISCUSSION

### I

### Admission of Evidence of Immigration Status

Casillas contends the trial court erred in admitting evidence of his immigration status and two deportations, arguing that such evidence was both irrelevant and unduly prejudicial, and violated his constitutional right to a fair trial. We disagree. As explained below, the evidence was strongly probative on the question of motive and the trial court took steps to minimize the potential for any undue prejudice.

### A. Proceedings in the Trial Court

At a pretrial hearing, the prosecutor raised the question of the admissibility of Casillas' status as an undocumented immigrant and his prior deportations.

12

The prosecutor explained that this case concerned the shooting of a deputy "basically out of nowhere on a traffic stop," raising the question of what would motivate someone to commit such a shooting. The prosecutor stated that although motive is not an offense element, "it is about as close to an element as it gets." On the issue of prejudice, the prosecutor argued it was unlikely the jury would convict Casillas of these serious charges simply because of his immigration status.

Defense counsel disagreed, arguing that evidence of immigration status elicited very strong reactions from jurors and was "prejudicial in most cases," particularly those involving serious charges. Counsel emphasized that Evidence Code section 351.4 recently was enacted to recognize and address such prejudice, and that the evidence in the case was simply "too prejudicial" for admission.[5]

The court acknowledged that Casillas was stopped not by immigration officials, but by a deputy sheriff. It found the prior deportations were "very probative of the circumstances involved in the case and the explanation as to why this event might have occurred." The court stated that while "[i]t's a very controversial

_____

[5] Evidence Code section 351.4 went into effect on May 17, 2018, and provides as follows: "(a)  In a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or his or her attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status.  [¶]  (b)  This section does not do any of the following:  [¶]  (1)  Apply to cases in which a person's immigration status is necessary to prove an element of an offense or an affirmative defense. . . ."  (Evid. Code, § 351.4, added by Stats. 2018, ch. 12, § 2.)

13

issue right now, . . . if we're looking at the issue of motive and is it relevant . . . there's no question that it's relevant." Thus, the ultimate question was whether "the probative value [was] substantially outweighed by the risk of undue prejudice in this case." The court noted that Casillas' flight to Mexico was admissible, and thus the jury would hear that he disappeared for "a period of almost [10] years" and was "ultimately arrested in Mexico."[6] The court told the parties it would instruct the jury that Casillas' immigration status could only be used "for the very limited purpose of motive," and was "not to be used for propensity." As such, the court ruled the evidence of Casillas' immigration status, and his prior deportations, would be admitted.

During closing statements, the prosecutor argued as follows: "[In] 2010, the defendant is a meth addict and an alcoholic. He's been deported two times, and he knows that if he is caught again, even here, he's likely to be sent to prison, fined, and deported again, especially if he is high, if he has a gun with him, the circumstances that night. . . . Now he's in the car thinking they got me for the Ramos thing. I got a gun in the car. I got tequila in the car. I got a pipe in the car. I'm not going, they're not catching me. I am not going to get stopped."

Prior to deliberations, the trial court provided the jury with the following limiting instruction, which was a modified version of

------

**6** The jury was instructed, pursuant to CALCRIM No. 372, that "[i]f the defendant fled immediately after the crime was committed, that conduct may show that he was aware of [his] guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." On appeal, Casillas does not assign any error to the trial court's admission of evidence regarding his flight from the country.

14

CALCRIM No. 316: "If you find that a witness has been convicted of a felony, committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony, whether the defendant had a motive to commit the crimes charged, or as an element in [c]ounts 3 and 5 as directed in the instruction for those crimes. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that makes the witness less believable. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."

## B. Standard of Review

On appeal, we review the trial court's rulings on the admission and exclusion of evidence for abuse of discretion. (*People v. Harrison* (2005) 35 Cal.4th 208, 230; *People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [relevance objection]; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 352 [Evid. Code, § 352 objection].)

"The trial court has broad discretion in determining the relevance of evidence [citations], but lacks [the] discretion to admit irrelevant evidence." (*People v. Crittenden* (1994) 9 Cal.4th 83, 132.) The trial court also has discretion to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

## C. Motive Evidence Pertaining to the Shooting of Law Enforcement Officers

In this case, the evidence was not simply that Casillas was an undocumented resident, but that he twice had been deported and was facing up to 20 years in prison if found in the United States. The prosecution argued this evidence was relevant to explain why

15

he might be motivated to shoot and kill a law enforcement officer during a routine traffic stop.  In light of these factual circumstances, we find instructive the opinions issued by our high court discussing the admission of prior crimes evidence as relevant to motive when a defendant is accused of shooting a law enforcement official.

1. *People v. Fuiava*

In *People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*), two sheriff's deputies were patrolling a neighborhood when they saw two young men.  After one of the men appeared to throw an object into a nearby yard, the deputies pulled over.  As one of the deputies exited the patrol car, he heard a series of gunshots, and crouched down and drew his weapon.  He heard another series of gunshots and found his partner lying on the ground near the patrol car.  His partner subsequently died from two gunshot wounds.  (*Id.* at pp. 636-637.)

The trial court permitted the prosecution to present in its case-in-chief evidence concerning the defendant's two prior convictions for assault with a firearm and his parole status at the time of the shooting.  (*Fuiava, supra*, 53 Cal.4th at p. 666.)  The evidence included testimony from the defendant's parole agent, who stated he had stressed the firearms prohibition with the defendant and told him that if he violated his parole, he would be returned to prison.  (*Id.* at p. 640.)

On appeal, the defendant argued the admission of this evidence was an abuse of discretion and violated his constitutional right to a fair trial.  (*Fuiava, supra*, 53 Cal.4th at p. 666.)  The high court disagreed.

In so concluding, the court first explained that while Evidence Code section 1101 prohibits admission of evidence regarding prior misconduct to establish a defendant's character or disposition, it

does not prohibit such evidence if relevant to some other fact, such as motive. (*Fuiava, supra,* 53 Cal.4th at p. 667.) Under the latter scenario, the trial court " 'has the discretion to admit such evidence after weighing the probative value against the prejudicial effect.' " (*Ibid.*) The court acknowledged, however, that because other crimes evidence " 'can be so damaging,' " the evidence should be excluded unless the connection between the evidence and " ' "the ultimate fact in dispute" ' " is clear. (*Ibid.*) The court found such a connection because the prosecution's theory was that the defendant knew that possession of firearms was both illegal and a violation of his parole status, and that he shot at the deputies "in order to avoid being apprehended and returned to prison." (*Id.* at p. 668.)

Furthermore, the court noted that the trial court limited the potential prejudicial effect of the prior crimes evidence by instructing the jury that the evidence could be considered only for the limited purpose of establishing the defendant's motive, and, thus, by negative implication, that it would be improper to consider this evidence to establish the defendant's criminal propensity. (*Fuiava, supra,* 53 Cal.4th at p. 669.)

2.     *People v. Robillard*

In *People v. Robillard* (1960) 55 Cal.2d 88 (*Robillard*),[7] the defendant was on probation for prior offenses and had committed other recent offenses for which he had not yet been apprehended. He was driving a stolen car with stolen license plates when he was stopped by a police officer. While the officer waited for information from headquarters about the status of the vehicle, the defendant shot and killed the officer. (*Id.* at pp. 92-93.) At trial, the defendant objected to the admission of evidence of his prior offenses

_____

[7] Disapproved on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 637, footnote 2, 648-649.

17

and his probationary status. On appeal, the high court held the evidence was properly admitted because it "was relevant to establish [the] defendant's motive for the killing, the prosecution's case being based on the theory that [the] defendant had premeditatedly killed [a police officer] in order to avoid apprehension for such crimes." (*Id.* at p. 100.)

　　3.　*People v. Durham*

　　In *People v. Durham* (1969) 70 Cal.2d 171 (*Durham*), two defendants were stopped during a routine traffic stop and one of them shot and killed a police officer. (*Id.* at pp. 176-178.) On appeal, the defendant who shot the officer argued it was error to admit evidence of his parole status and the joint criminal activities of the defendants during the three weeks preceding the incident. The high court disagreed, observing the defendant "overlook[ed] the great probative value of the evidence throwing light upon his state of mind at the moment of confrontation." (*Id.* at pp. 187-188.) The high court found the evidence was relevant and material on the issues of premeditation, motive, and intent. (*Id.* at p. 187.) In so concluding, the high court cited and discussed several cases involving the shooting of law enforcement officers, including *Robillard*, wherein prior crimes evidence was deemed relevant to explain why defendants might be motivated to shoot and kill law enforcement officials, i.e., to avoid detection and arrest and " ' "the severe punishment meted out to them which the law affixes to the crime." ' " (*Id.* at p. 189.)

## D.　Limitation on Prior Crimes Evidence as Motive

　　In *People v. Alcala* (1984) 36 Cal.3d 604, our high court confronted the admission of prior crimes evidence in a case where the defendant, who kidnapped the victim, subsequently murdered her. (*Id.* at pp. 614-616, 634.) The high court explained that "[c]ommon sense indicates that one who commits a felony upon

another wishes to avoid its detection.  That may lead him to the calculated murder of his victim.  Here, the jury could consider the possibility that [the] defendant killed [the victim] in cold blood to prevent her from naming him as her kidnaper." (*Id.* at pp. 634-635.)  The court, however, rejected "any implication that the prior crimes were admissible to establish a *motive* for premeditated murder." (*Id.* at p. 634.)  Though the prosecutor argued the defendant's prior crimes increased his incentive to eliminate the victim as a witness (since they might result in more severe punishment for the current offense), the high court found this argument inappropriate:  "We cannot accept the notion that evidence of past offenses is admissible on this basis.  If it were, one's criminal past could always be introduced against him when he was accused of premeditated murder in the course of a subsequent offense.  The accused's mere status as an ex-criminal would place him under an evidentiary disability not shared by first offenders.  The prejudicial effect of the prior-crimes revelations would vastly outweigh their slight and speculative probative value.  It is just such dangers which the restrictions on evidence of past offenses seek to avoid." (*Id.* at p. 635.)

The high court, however, expressly distinguished cases such as *Robillard* and *Durham*, explaining that "[i]n cases like *Durham* and *Robillard*, the motive of escape is central, and it can be shown in no other way." (*People v. Alcala, supra*, 36 Cal.3d at p. 635.) However, in the case before it, "the issue of witness elimination was before the jury in any event; speculation that [the] defendant was also worried about the implications of his past record is remote and cumulative." (*Ibid.*)  The high court concluded the trial court erred in admitting the prior-crimes evidence.  (*Ibid.*)

19

**E.    The Trial Court Did Not Abuse Its Discretion in Admitting the Challenged Evidence**

As in *Fuiava*, *Robillard*, and *Durham*, in this case a shooting occurred after a law enforcement officer sought to stop or detain an individual.  Like the defendants in those cases, Casillas had a history of criminal misconduct with a potential for long-term incarceration, which could explain his motive for shooting Deputy Rosales.

" '[The] general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' [Citation.]" (*Durham, supra,* 70 Cal.2d at p. 186.)  While motive is not an element the prosecution must prove, " '[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence.' " (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017.)  This is because "[m]otive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (*Ibid.*)

The likelihood that Casillas' apprehension would result in a substantial period of incarceration was probative in establishing that Deputy Rosales posed a serious threat to his freedom.  (See *People v. Heishman* (1988) 45 Cal.3d 147, 169 [citing *Robillard* and *Durham* as examples wherein the high court "*allowed* evidence of outstanding offenses for which the defendants feared apprehension," and explaining that cases requiring similarity between the prior crime and the instant offense were wholly inapplicable in such circumstances].)  Thus, contrary to Casillas' assertion, the challenged evidence was indeed relevant and substantially probative.

20

To the extent Casillas relies on *Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, that reliance is entirely misplaced. *Velasquez* involved a product-related personal injury action. The trial court determined the plaintiff's immigration status was relevant to damages because it could impact whether or not he qualified for a lung transplant. Based on this initial ruling, the court informed prospective jurors about the plaintiff's immigration status during voir dire. (*Id.* at pp. 1202-1205.) At trial, it emerged that the policy regarding transplant approvals did not allow consideration of residency or immigration status. The trial court thereafter concluded that the plaintiff's immigration status was wholly irrelevant to the action. (*Id.* at p. 1208.) The court excluded any evidence on the issue, but denied the plaintiff's motion for mistrial.

On appeal, the Court of Appeal concluded the evidence was irrelevant and prejudicial because it could have improperly influenced the jury's evaluation of causation, the critical issue in the case. (*Velasquez v. Centrome, Inc.*, *supra*, 233 Cal.App.4th at pp. 1214-1215.) The court reasoned that a juror could have found the plaintiff never would have become sick but for his presence in the country illegally. (*Id.* at p. 1216.)

Here, in contrast, the evidence most certainly was relevant, and the trial court mitigated any potential prejudice with its limiting instructions. In particular, the trial court instructed pursuant to a modification of CALCRIM No. 316 that the evidence could be considered to show that Casillas had a motive to murder Deputy Rosales, but not to show any criminal propensity. The trial court also instructed the jury with CALCRIM No. 200, which states that jurors should not be moved by bias or prejudice, including any bias based on "nationality" or "national origin." We presume jurors

follow instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17; see also *People v. Delgado* (1993) 5 Cal.4th 312, 331.)

Furthermore, we note that the prosecutor did not attempt to use the evidence to an improper advantage, but rather cautioned the jury not to use Casillas' previous deportations as a reason to find him guilty, or as a basis to find him not guilty out of sympathy.

In the present case, Casillas was an admitted ex-felon, had twice been deported, and was facing a sentence of up to 20 years if arrested and presented for prosecution. Casillas was stopped by a deputy for a traffic stop while in possession of a firearm and, according to his own testimony, methamphetamine. In light of these facts, Casillas was fully aligned with the defendants in *Fuiava*, *Robillard*, and *Durham*, who, facing the threat of potential incarceration due to a history of prior misconduct, opened fire on law enforcement officials to effectuate their escape.

Based on the significant probative value of the challenged evidence and the trial court's limiting instruction to avoid its potential prejudice, the trial court did not abuse its discretion in admitting the evidence of Casillas' immigration status. For the same reasons, we find no merit in Casillas' contention that the admission of the evidence violated his constitutional right to a fair trial. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230 & fn. 13 [the admission of evidence violates due process only if no permissible inference may be drawn from it]; see also *People v. Riggs* (2008) 44 Cal.4th 248, 292 [to the extent the defendant's constitutional claim was "merely a gloss on the objection raised at trial," it was without merit because the trial court did not abuse its discretion in admitting the evidence].)

22

## II
## Sufficiency of the Evidence to Support the Premeditation Finding on Count 1

Casillas argues the evidence was insufficient to support the jury's finding that he premeditated the attempted murder, as charged in count 1. We disagree.

### A. Relevant Legal Principles

In a criminal case, the prosecution bears the burden of proving each and every element of the offense beyond a reasonable doubt. (*Estelle v. McGuire* (1991) 502 U.S. 62, 69 [112 S.Ct. 475, 116 L.Ed.2d 385].) In reviewing the sufficiency of the evidence, "[w]e view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028.) We do not reweigh evidence, reevaluate the credibility of witnesses, or resolve factual conflicts. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Culver* (1973) 10 Cal.3d 542, 548.)

Casillas was charged with the willful, deliberate, and premediated attempted murder of a peace officer, which subjected him to enhanced penalties. (§ 664, subds. (e) & (f).) An intentional attempted killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than an unconsidered or rash impulse. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264.)

### B. Substantial Evidence Supports the Jury's Finding of Premeditation

In assessing evidence of premeditation and deliberation, we consider as a framework for our review: (1) planning activity; (2) a prior relationship with the victim supporting a motive to kill; and

(3) the manner of killing. (See *People v. Thomas* (1992) 2 Cal.4th 489, 517; *People v. Anderson* (1968) 70 Cal.2d 15, 26-34.)

Applying this framework, the trial record discloses sufficient evidence to persuade a rational trier of fact that Casillas premeditated the attempted murder.

1.      *Planning*

Deputy Rosales testified that during the traffic stop, after activating her lights, Casillas' truck pulled over to the curb. As she began to exit her patrol car, however, the driver started slowly driving the truck again, proceeded north to an area where a streetlight was out, and stopped in the middle of the road in front of her. As Deputy Rosales approached the truck, the windows initially were rolled up, but as she moved closer toward the driver the windows were partially rolled down. Casillas had his face pressed against the driver's window to cover the lower half of his face. No voices or movement came from inside the vehicle. A jury reasonably could have determined that Casillas' conduct evidenced the type of tactical planning consistent with an ambush.

Casillas nevertheless argues that there was " 'no evidence of planning' " because "[Deputy] Rosales testified that the entire incident from exiting the vehicle until shots were fired was maybe five to seven seconds." We disagree. A jury could have reasonably determined that Casillas' planning to avoid arrest began as early as when Deputy Rosales initiated the stop and continued as he found a dark spot where he would have the advantage of darkness to kill her without being observed. Moreover, in assessing premeditation and deliberation, the " ' "[t]est is not time, but reflection," ' " as " ' " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 697.)

24

## 2. *Manner of Killing*

Casillas fired several times, from close range, at Deputy Rosales. The firing of multiple shots at close range strongly supports a finding of premeditation and deliberation. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348 [affirming finding of premeditation where the victims were shot in the head, one from point-blank range and the other from a distance of one foot]; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [the manner of killing was indicative of premeditation and deliberation where five or six shots were fired from a car five feet from the victim].)

Casillas points out that "[Deputy] Rosales merely sustained scarring on the elbow and a bruised right hip." Based on her injuries, he argues the manner of the shooting "was not such a particular and exacting manner to indicate a preconceived design to take [Deputy] Rosales' life." The jury, however, reasonably could have determined that Casillas planned to kill Deputy Rosales, but that her precautionary measures of shining a spotlight to blind the driver, approaching cautiously, and drawing her own weapon, caused Casillas to fire his shots with less than optimal precision. In other words, the jury was permitted to view the evidence and circumstances as whole. (*People v. Cook* (1940) 15 Cal.2d 507, 516 [explaining the jury may determine premeditation from a variety of circumstances].)

## 3. *Motive*

Although there was no personal relationship between Casillas and Deputy Rosales, motive was not lacking. As discussed above, the evidence of Casillas' deportation history supplied a reasonable inference of his motive to kill a deputy initiating a traffic stop.

In sum, there was sufficient evidence to support the jury's finding that Casillas' act of firing at Deputy Rosales was willful, deliberate, and premeditated.

## III
## Denial of Requested Instructions on Self-defense
## and Imperfect Self-defense

Casillas contends the trial court erred in refusing his request to instruct the jury on self-defense and imperfect self-defense. We disagree.

### A   Proceedings Below

Defense counsel requested the trial court instruct the jury with CALCRIM No. 505 (Justifiable Homicide: Self-Defense) and CALCRIM No. 604 (Attempted Voluntary Manslaughter: Imperfect Self-Defense). Defense counsel argued the jury was not required to believe all of Casillas' testimony, and that if they concluded Casillas was the driver or shooter, self-defense might apply.

In so asserting, counsel noted that Casillas "did say he was fearful of being shot when he was ducking down." The court responded, "I think he was afraid of the fire fight that was going on and he ducked down or slid down, were his words. But there isn't any evidence in this record that would warrant the giving of self-defense instructions at all." The court denied the instructional request, stating that even if the jury disbelieved Casillas' testimony, there existed no evidence from which the jury could conclude that Casillas was afraid he was in "imminent danger of being shot" by Deputy Rosales.

### B.   Relevant Legal Principles

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case. (*People v. Blair* (2005) 36 Cal.4th 686, 744; *People v. Valdez* (2004) 32 Cal.4th 73, 115.) Self-defense arises when the defendant actually and reasonably believes in the need to defend against imminent bodily injury or death. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

26

A killing committed when that belief is unreasonable does not exonerate the person completely. (*Ibid.*) Nevertheless, "[u]nder the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) Although a trial court has a sua sponte duty to instruct on the theory of imperfect self-defense whenever there is substantial evidence to support that theory, it has no sua sponte duty to instruct on self-defense if the defendant is not relying on that theory at trial, or the theory would be inconsistent with the defendant's theory of the case. (*People v. Simon* (2016) 1 Cal.5th 98, 134; *People v. Elize* (1999) 71 Cal.App.4th 605, 611-612.) If, however, a defendant expressly requests the court to instruct on self-defense, the court must do so if there is substantial evidence to support the theory. (*Simon, supra*, at p. 134; *Elize, supra*, at pp. 611-612.) Thus, in the present case, whether the trial court erred in denying the perfect or imperfect self-defense instructions requested by Casillas turns on whether the record contains substantial evidence to support either theory. We review this question de novo. (*Simon, supra*, at p. 133; *People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.)

## C.    The Record Lacks Substantial Evidence to Support the Requested Instructions

In the context of jury instructions, "[s]ubstantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) Speculative, minimal, or insubstantial evidence is insufficient to require an instruction.

27

(*People v. Mendoza* (2000) 24 Cal.4th 130, 174; *Barton*, *supra*, at p. 201.)

According to Casillas, the evidence in the record warranted his requested self-defense instructions because the jury could have rejected all or part of his testimony, and concluded he was the shooter. The jury also could have rejected Deputy Rosales' testimony, and based on the circumstantial evidence, further concluded that Deputy Rosales, either intentionally or accidentally, initiated the gunfire. As explained below, the "evidence" cited by Casillas in support of his instructional error claim falls squarely within the realm of speculative and/or minimal evidence. On this point, *People v. Sinclair* (1998) 64 Cal.App.4th 1012 (*Sinclair*), is instructive.

In *Sinclair*, the defendant was arrested after fleeing the country for a shooting that took place at a tavern. (*Sinclair*, *supra*, 64 Cal.App.4th at p. 1017.) At trial, the defendant testified to several threatening interactions with patrons at the bar and testified he fled after hearing a shot ring out; he was unarmed and did not see who was shot. (*Ibid.*)

On appeal, he argued the jury should have received heat of passion and imperfect self-defense voluntary manslaughter instructions. The appellate court queried whether there was circumstantial evidence entitling the defendant to instructions on voluntary manslaughter. (*Sinclair*, *supra*, 64 Cal.App.4th at p. 1016.) Based on his testimony denying he shot the victim, or that he even was armed, "none of the alleged evidence of heat of passion and imperfect self-defense was of the type 'that a reasonable jury could find persuasive.' [Citation.]" (*Id.* at p. 1020.) The court observed: "We do not mean to suggest that every time the accused completely denies under oath any participation in the charged homicide, there is no duty to instruct on lesser and necessarily

28

included offenses. . . . [T]he accused may confess or make admissions which indicate the fatal shooting occurred, for example, in the heat of passion." (*Ibid.*) The court concluded there was no such conflicting evidence in the record. (*Ibid.*)

Here, the logic of *Sinclair* applies with equal force. Casillas denied he was the shooter, and presented no other evidence to support the inference that he (or Henry, the alleged driver) feared imminent harm from Deputy Rosales.

Specifically, Casillas testified that when Henry stopped the truck, "[I]t all happened very quickly." Casillas "was only able to see that [Henry] wanted to hide the back [*sic*] where he had the weapon; he had the weapon, and then suddenly the shots." When asked if he could tell from "where the shots came from," Casillas responded, "No. At the time, I don't know. I know it was—it was loud. The shots were loud, and the only thing that I could do at the time was to slide." When asked if he was "aware at some point that Henry was shooting also," Casillas responded, "I don't know." Counsel followed up by asking, "Did you hear shots from inside the vehicle, outside the vehicle, or both, or you don't know?" Casillas responded, "They were just repeated shots. I don't know where they came from, inside or outside. They were just shots. I just slid down."

Casillas relies on Deputy Rosales' testimony that she did not recall firing her weapon to argue that she may have fired first. This assertion is premised on a misapprehension of the trial record. Deputy Rosales testified that as she approached the vehicle, and saw the driver's face pressed against the glass, she drew her weapon and said, "Let me see your hands." Before she completed her command, shots were fired and she was struck. Her next memory was that she was standing behind the truck. Although she did not recall firing her weapon, she *did* recall that she was fired

29

upon first and only thereafter lost track of events. As such, Casillas' assertion that Deputy Rosales' gun "accidentally" discharged when she drew her weapon, is based on nothing more than pure speculation. (*People v. Young* (2005) 34 Cal.4th 1149, 1200 [stating that a "trial court need not give instructions based solely on conjecture and speculation"].)

As further support for his theory, Casillas relies on testimony by a bystander that he heard two shots, a short pause, and then three additional shots. However, the bystander's testimony was far from clear on this point and, in any event, would neither contradict nor undermine Deputy Rosales' testimony.[8]

Deputy Rosales herself testified that she heard two muffled shots and then felt pain. Thus, assuming that two shots were fired, followed by a break, this could simply mean that the driver fired two shots and then Deputy Rosales fired back while the driver fired an additional shot. Casillas' supposition that Deputy Rosales was first to fire by accidentally discharging her firearm is not only speculative but contrary to Deputy Rosales' testimony that she only "panicked" after hearing shots and being struck by gunfire. Furthermore, he points to no forensic or expert testimony in the trial record to support such a conclusion.

Viewed against the backdrop of all the evidence presented at trial, Casillas' proposed theories give rise, at best, to a mere

---

[8] The bystander initially testified that he heard "four or five shots" and that he thought there was a break after the first two. However, when asked if the shots sounded like they were from the same or different guns, he responded that they all sounded "the same." When again questioned on the topic, he testified he thought he heard "around five to six shots" but he could not remember, and that he believed there was an interval at some point between the shots, but wasn't "a hundred percent" sure.

"possibility" that the driver fired his weapon because he believed he was in imminent fear for his life. That, however, is not enough. In adopting the substantial evidence standard regarding instructional duties, our high court expressly disapproved of any suggestion "that jury instructions must be given whenever *any* evidence is presented, no matter how weak." (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12; see also *People v. Young*, *supra*, 34 Cal.4th at p. 1200.) To assign error in this case would require us to wholly contravene this principle, which we decline to do.

## IV
## CALCRIM No. 315

The trial court instructed the jury pursuant to CALCRIM No. 315, the standard Judicial Council instruction regarding eyewitness identification. The instruction directs the jury to consider a number of factors in evaluating eyewitness testimony, including the witness's level of certainty.[9] Casillas argues the inclusion of this factor violated his due process rights. Respondent counters that the issue is forfeited by Casillas' failure to seek modification of the instruction at trial; and the claim has been rejected by the California Supreme Court. We agree with respondent on both points.

### A. Relevant Law

The predecessor instruction to CALCRIM No. 315 is CALJIC No. 2.92, which instructs the jury to consider any factor that

---

[9] CALCRIM No. 315 reads in relevant part: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] . . . [¶] How certain was the witness when he or she made an identification?"

31

"bear[s] upon the accuracy of the witness' identification of the defendant, including, . . . [¶] . . . [¶] [t]he extent to which the witness is either certain or uncertain of the identification." At the time of trial in this case, the California Supreme Court had upheld the inclusion of the certainty factor in CALJIC No. 2.92 on at least three occasions. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461-463 (*Sánchez*); *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232; see *People v. Wright* (1988) 45 Cal.3d 1126, 1144.)

In *Sánchez*, the court acknowledged that "some courts have disapproved instructing on the certainty factor in light of the scientific studies." (*Sánchez, supra*, 63 Cal.4th at p. 462.) Nonetheless, in *People v. Lemcke* (May 27, 2021, S250108) ___ Cal.5th ___ [2021 WL 2150610] (*Lemcke*), our high court reexamined the propriety of CALCRIM No. 315, and concluded that inclusion of the certainty factor did not violate the defendant's due process rights when considered in the context of the trial as a whole. (*Lemcke, supra*, at pp. ___ [2021 WL 2150610 at pp.*1, *8-*11].) In reaching this conclusion, the court noted the instruction did not direct the jury that " 'certainty equals accuracy' "; the instruction included the eyewitness's level of certainty as one of 15 enumerated factors; the defendant was permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated; and the instruction expressly stated that the prosecutor must establish the defendant's identity as the perpetrator beyond a reasonable doubt. (*Id.* at pp. ___ [2021 WL 2150610 at pp. *1, *8-*9].)[10]

---

[10] Nevertheless, the high court referred the matter to the Judicial Council to evaluate how the instruction might be modified to avoid juror confusion on the issue of witness certainty, and exercised its supervisory powers to direct trial courts, in the

**B.     Casillas is Not Entitled to Relief**

      1.     *The Claim is Forfeited*

Casillas interposed no objection to the instruction below, and the trial court was under no obligation to either give or modify CALCRIM No. 315 on its own motion.  (See *People v. Cook* (2006) 39 Cal.4th 566, 599 [no sua sponte duty to give the standard instruction on eyewitness identification]; *People v. Ward* (2005) 36 Cal.4th 186, 213 [no sua sponte duty to modify the standard instruction on eyewitness identification].)  Thus, like the defendant in *Sánchez*, Casillas forfeited any objection to the court's instruction.  (See *Sánchez*, *supra*, 63 Cal.4th at p. 461 ["If defendant had wanted the court to modify the [certainty] instruction, he should have requested it.  The trial court has no sua sponte duty to do so"].)

      2.     *The Claim Lacks Merit*

Even assuming the claim had been preserved, we conclude it has no merit.

First, as in *Lemcke* and *Sánchez*, the trial court's instruction did not deny Casillas the opportunity to challenge the accuracy of the identification by Ramos and Deputy Rosales, but merely advised the jury that certainty was one of many factors to consider in evaluating identification testimony.  (*Lemcke*, *supra*, ___ Cal.5th ___ [2021 WL 2150610 at pp. *8-*9]; *Sánchez*, *supra*, 63 Cal.4th at p. 462.)  The instruction explicitly advised the jury that the prosecution had the burden of proving the perpetrator's identity beyond a reasonable doubt.  (CALCRIM No. 315 ["The People have the burden of proving beyond a reasonable doubt that it was the

_____

interim, to omit the certainty factor from the instruction unless a defendant requests otherwise.  (*Lemcke*, *supra*, ___ Cal.5th ___ [2021 WL 2150610 at pp. *2, *15, *16].)

defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty"].)

Second, as in *Lemcke*, the jury heard detailed testimony from eyewitness identification expert Dr. Eisen, regarding the dangers of eyewitness identification testimony, including the lack of correlation between certainty and accuracy outside of pristine, non-suggestive identification procedures. As in *Lemcke*, the jury was instructed with CALCRIM No. 332 that it " '*must* consider' " the expert's opinion. (*Lemcke, supra*, ___ Cal.5th ___ [2021 WL 2150610 at p. *9].)

Finally, two eyewitnesses (Deputy Rosales and Ramos) identified Casillas with a firearm and identified his truck. The two incidents occurred within 12 hours of each other, and in reasonably close geographical proximity of one another. Casillas admitted at trial that he was in the truck during the incident involving Deputy Rosales, but claimed someone else was the driver. However, Deputy Rosales neither saw nor heard anyone else in the truck, while Casillas' girlfriend, Castellanos, testified that when she spoke with Casillas after the incident, he gave her no indication that anyone had been with him that night.

In light of this record, we are confident that the inclusion of the certainty factor did not result in prejudicial error. (See *Lemcke, supra*, ___ Cal.5th ___ [2021 WL 2150610 at p. *16] [concluding the defendant failed to establish that inclusion of the certainty factor "violated his due process rights or otherwise constituted error under the circumstances" of the trial as a whole]; *Sánchez, supra*, 63 Cal.4th at p. 462 [discerning no prejudice to the defendant in light of the overall strength of the evidence and because the instruction did not equate certainty with accuracy]; see also *People v. Wright, supra*, 45 Cal.3d at pp. 1144-1145 [concluding any error in failing to give the instruction requested by the defense on eyewitness factors

was harmless in light of, inter alia, the overall strength of the evidence and the fact that factors relating to the reliability of the eyewitness identification were brought to the jury's attention by cross-examination and arguments of counsel].)

# V

## Prosecutorial Error During Closing Argument

Casillas contends the prosecutor's "repeated legal misstatements," "dilutions" of the reasonable doubt standard, and "profane vouching" during closing argument violated his constitutional rights. Respondent counters the claims are forfeited due to trial counsel's failure to object to the lines of argument challenged by Casillas. We agree the objection was forfeited. We also conclude that even if the claims were not forfeited, any misstatements by the prosecutor were harmless in view of the weight of the evidence.

## A.  Casillas Has Forfeited His Claims of Prosecutorial Error

Casillas acknowledges defense counsel interposed no objection below. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 281.) Citing *People v. Hill* (1998) 17 Cal.4th 800, 820 and *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585, Casillas claims that "forfeiture does not apply when, as here, an admonition would not have cured the harm caused by the misconduct." Casillas, however, provides no argument explaining why an admonition would have failed to cure any purported harm. (Cf. *Hill*, *supra*, at pp. 820-822 [providing an analysis of why an objection by counsel would have

35

been futile under the circumstances, including reference to the trial court's critical comments in response to prior objections]; *Alvarado, supra,* at p. 1585 [concluding that any curative admonition would have failed to cure the harm due to the egregious nature of the vouching by the prosecutor].)  In failing to argue these exceptions, Casillas has forfeited any assertion of error regarding the challenged statements.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)

## B. Harmless Error Analysis

"Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334.)  Here, the evidence of guilt was so strong that applying even the more stringent standard, any error was harmless.

As previously discussed, the crux of the case centered on the identity of the gunman.  Two witnesses, Ramos and Deputy Rosales, saw Casillas driving a truck and holding a gun only hours between the two incidents.  Although Deputy Rosales had a somewhat obstructed view of Casillas, she had direct eye contact with him.  She neither saw nor heard anyone else in the truck. Ramos's identification was extremely credible because he recognized Casillas immediately upon seeing his picture in the newspaper.  The evidence strongly supported the conclusion that the truck involved in both incidents belonged to Casillas.  Given his criminal and deportation history, Casillas had a compelling motive to kill Deputy Rosales.  Thus, "[w]hether considered under this state's 'reasonable likelihood of a more favorable verdict' standard or the federal 'harmless beyond a reasonable doubt' standard," any

prosecutorial error was harmless.  (*People v. Rivera*, *supra*, 7 Cal.5th at p. 335.)[11]

## DISPOSITION

The judgment is affirmed.
CERTIFIED FOR PARTIAL PUBLICATION


FEDERMAN, J.[*]


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

---

[11] In a one-line argument, Casillas claims that "defense counsel's deficient failure to object [to the prosecutor's argument] unreasonably denied the effective assistance constitutionally guaranteed by . . . the Sixth and Fourteenth Amendments."  In view of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 80 L.Ed.2d 674]), and the lack of reversible error, we reject Casillas' conclusory claim.

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.